(C. D. 1665)

DAVIES TURNER & COMPANY *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 22, 1954)

*Wallace & Schwartz* (*Barnes, Richardson & Colburn* by *Edward N. Glad* and *Joseph Schwartz* of counsel) for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*William J. Vitale, Arthur R. Martoccia*, and *Richard M. Kozinn*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; FORD, J., dissenting

LAWRENCE, Judge: This case presents for our determination the proper classification and assessment with duty of certain electrically operated slicing machines.

The collector of customs assessed duty on the mechanisms at the rate of 27½ per centum ad valorem pursuant to the provision in para-

graph 372 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 372), reading as follows:

PAR. 372. * * * all other machines, finished or unfinished, not specially provided for, 27½ per centum ad valorem: *Provided*, That parts, not specially provided for, wholly or in chief value of metal or porcelain, of any of the foregoing, shall be dutiable at the same rate of duty as the articles of which they are parts: * * *

It is the contention of plaintiff herein that the importations should have been assessed with duty at the rate of 15 per centum ad valorem either within the provisions of paragraph 353 of said act (19 U. S. C. § 1001, par. 353), as modified by the General Agreement on Tariffs and Trade (82 Treas. Dec. 305, T. D. 51802), or of paragraph 372 of said act, as modified by the General Agreement on Tariffs and Trade, *supra*, the pertinent provisions of which read—

[353] Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for:

\*       \*       \*       \*       \*       \*       \*

Other articles (except machines for determining the strength of materials or articles in tension, compression, torsion, or shear; flashlights; batteries; vacuum cleaners; and internal-combustion engines) _____ 15% ad val.

[372] Machines, finished or unfinished, not specially provided for:

\*       \*       \*       \*       \*       \*       \*

Other (except wrapping and packaging machines; food grinding or cutting machines; machines for determining the strength of materials or articles in tension, compression, torsion, or shear; machines for making paper pulp or paper; machines for manufacturing chocolate or confectionery; and internal-combustion engines) _____ 15% ad val.

At the trial, two witnesses were called, one for each side. Illustrative exhibit 1 was introduced to provide a graphic description of the imported machines, and illustrative exhibit 2, on the reverse side of exhibit 1, was intended to show how a flywheel similar to that in exhibit 1 operates.

Plaintiff's witness R. V. D. Terry testified that for a period of 4 years he had been in the employ of the Berkel Patent Co., consignee herein, the business of which company is the importing and exporting of food-preparing machinery; that his duties were to buy and sell such equipment; that, before entering the employment of the Berkel company, he had been engaged for many years in various capacities with a manufacturing firm selling and handling the same type of food-preparing equipment.

Terry identified the merchandise here under consideration which is illustrated by exhibit 1 except that the motor, pulley, and handle were not incorporated in the merchandise at the time of importation; that, as a matter of fact, the machines in this importation merely had a threaded hole on the flywheel in which a handle could be placed by a serviceman for adjustment purposes but that, from a practical standpoint, the machine could not be operated by hand. Terry testified that these machines were sold in their condition as imported to the United States Slicing Machine Co.; that he had seen such machines in operation at the plant of that company, in butcher shops, and other food stores; and that before the machines were put into operation, a motor and a motor pulley were added.

When the witness was asked if he ever tried to operate the machines in controversy by hand, he replied "Only for adjusting purposes." He explained that by saying—

Well, this machine is known as the all electric automatic stacking machine. It slices the meat and through mechanism picks up the slice as it leaves the knife and deposits it on the table. That mechanism in conjunction with the knife must be perfectly timed and the mechanism itself must be in perfect order, otherwise there is, there comes about a friction of parts.

To accomplish this, Terry testified—

Well, we adjust the fly finger to the needle drum for one thing. We adjust the needle drum in its proximity to the knife so that there will be no contacts and yet only a tiny space between them. Those are the main adjusting items in connection with this type of machine.

The record discloses that the machine has certain movable parts, such as the meat table, marked "X" on exhibit 1, and the stacking mechanism, marked "Y," both parts being carefully synchronized. An electric one-quarter horsepower motor is installed to operate the moving and slicing parts. In other words, it is the power that operates the machine. The witness described the machine as measuring 5 feet in length "probably three and a half feet in width; from the bottom to the top, it must be two and a half feet, probably weighs net 430 pounds." He stated that he had never seen a machine like that in controversy being operated by hand, except for adjusting purposes, explaining "Its capacity is so large for the type of meat it would slice, the machine is so big and heavy, no one would try to do it by hand"; that, in addition to the motor, the machine had other electrical features, such as a switch and wiring.

When asked if this machine was designed to operate by any other sort of power than electrical, the witness answered "No, sir."

On cross-examination, Terry reiterated that the only practical purpose for which the machine could be operated by hand was to accomplish certain adjustments; that, at the time of importation, the machine was wired for certain electrical purposes; and that further wiring is installed before the machine is ready for operation.

The witness further testified that the pulley, above referred to, is connected with the electric motor and is installed within the chassis itself. He was positive in his statement that none other than electrical motive power could be used in the imported machines for practical commercial purposes.

The defendant called as its witness Parke K. Linsley, an examiner of merchandise at the port of Chicago for approximately 3 years and, for some 13 years prior thereto, an examiner's aid in the same office. He testified that in his official capacity he had worked in the "metals division" where machines, household utensils, and basic metals were inspected and examined, and that he had an engineer's degree in mining and metallurgy from the University of Minnesota. Based upon his statement that a one-quarter horsepower motor is used to operate the machine in controversy, the witness was asked to state his opinion as to whether or not an average person could operate such a machine manually to which he replied "Yes, an adult can produce more than one-quarter horsepower" and maintain it for an extended period of time.

On cross-examination, Linsley admitted that a one-quarter horsepower motor would give a more even speed to a flywheel than operation by hand. He further admitted that if a flywheel were used to operate the mechanism and had to be synchronized to a certain speed, better results would be achieved through the use of a motor than by manual power.

To fall within the provisions of paragraph 353, *supra*, invoked by plaintiff, it is a positive requirement that an article be essentially an electrical device, and plaintiff relies upon the decision of our appellate court in *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050, in support of its contention that the subject machines are essentially electrical in their operation and are within the class of articles named in paragraph 353. The court in the *Dryden* case said in part—

There are two inquiries, therefore, when the question of the classifiability of an article under this division of the paragraph is under consideration: First, is it essentially an electrical article? The electrical feature must be an essential feature, without which the article will not function, normally, for the purposes intended, for, it must be manifest, that if it be not an electrical article; it does not come within the division at all. Second, if it is such an electrical article, is it an article named in the language, or within the class of articles named in this paragraph?

The record amply demonstrates that the imported food-cutting machines were designed to be and, after importation, were equipped with an electric motor which operates a meat table upon which meat is placed and fed toward the knife and the stacking mechanism which must synchronize with the meat table in order for the machine to

work properly, and, furthermore, that it would not be commercially practical to operate the machine by manual or any other power. We are satisfied from the evidence before us that the requirements set forth in the *Dryden* case, *supra*, to constitute a device as "essentially an electrical article" have been fulfilled.

Defendant, in its brief, contends that even assuming for the sake of argument the machines in controversy do have as an essential feature an electrical element or device they are not machines of the class named in paragraph 353. It will be observed that said paragraph names the following exemplar articles: Electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs—a variety of articles widely differing in many mechanical and physical respects but all having the common attribute of being essentially electrical articles. Therefore, the meat-slicing machines in controversy are in the language of the *Dryden* case, *supra*, "within the class of articles named in this paragraph [353]."

We have examined the case of *Julius Forstmann & Co.* v. *United States*, 28 C. C. P. A. (Customs) 222, C. A. D. 149, and other authorities cited by defendant and find nothing therein inimical to the conclusion above stated.

Upon the record and for the foregoing reasons, we find and hold that the meat-slicing machines in controversy are electrical articles within the purview of paragraph 353 of the Tariff Act of 1930, as modified, *supra*, and are properly dutiable at the rate of 15 per centum ad valorem, as claimed by plaintiff. That claim is sustained and all others are overruled.

Judgment will issue accordingly.

### DISSENTING OPINION

FORD, Judge: According to the official report of the collector of customs, submitted on customs Form 4297, "The merchandise covered by the annexed protest was classified in liquidation as food cutting machines under paragraph 372 of the Tariff Act of 1930, as amended, and assessed with duty at the rate of 27½% ad valorem."

The factual situation in this case is not in dispute. My disagreement with my associates is based entirely upon the construction which they have placed on paragraph 353 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

As stated above, the merchandise was classified as "food cutting machines," and, at the trial, it was agreed between counsel "that the slicing machine involved herein is a food cutting machine."

So far as here pertinent, the provisions of paragraph 353, as amended, *supra*, are as follows:

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for:

*   *   *   *   *   *   *

Other articles (except machines for determining the strength of materials or articles in tension, compression, torsion, or shear; flashlights; batteries; vacuum cleaners; and internal-combustion engines), 15% ad val.

There is no attempt by the majority to classify the involved merchandise as "Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy," under the first part of said paragraph 353. The majority opinion contains the following:

To fall within the provisions of paragraph 353, *supra*, invoked by plaintiff, it is a positive requirement that an article be essentially an electrical device, * * *.

*   *   *   *   *   *   *

* * * It will be observed that said paragraph names the following exemplar articles: Electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs—a variety of articles widely differing in many mechanical and physical respects but all having the common attribute of being essentially electrical articles. Therefore, the meat-slicing machines in controversy are in the language of the *Dryden* case, *supra*, "within the class of articles named in this paragraph [353]."

The following is quoted from *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050, as being particularly applicable:

Two electric motors accompanied the machine. The exact capacity of these motors is not shown, although it is stated that one of them is "very small." One motor furnishes the motive power for the machine. This motor is attached to the bottom plating of the machine. The other small motor is mounted on the "right-hand side" of the machine and furnishes the motive power for two small emery wheels, each about 2 inches in diameter, which are in constant contact with the blade, one from the top and one from the bottom. This is shown to be necessary, as "the blade must be kept in a continuous sharp condition."

When the machine was imported, bolt holes for the attachment of these two motors had been provided in the proper places. As to the grinding element, the invoice designates it as "1 grinding machine with motor starter (built-in)." No photographs or exhibits have been furnished and our knowledge of the character and appearance of the machine is confined to the record, as above stated.

*   *   *   *   *   *   *

An examination of the language of the third division of this paragraph discloses that the articles therein *eo nomine* specified are of various types; they have, however, one characteristic in common, an essential electrical feature. A fan, a washing machine, and a sign seem to have little resemblance, but their analogy rests in the fact that electricity is the essential feature which causes them to function and perform their work. The language evidently was intended to be read, "articles * * * such as electric motors, fans", etc., thus giving these named articles as examples of such as are intended to be covered by the paragraph.

*   *   *   *   *   *   *

There are two inquiries, therefore, when the question of the classifiability of an article under this division of the paragraph is under consideration: First, is it essentially an electrical article? The electrical feature must be an essential feature, without which the article will not function, normally, for the purposes intended, for, it must be manifest, that if it be not an electrical article, it does not come within the division at all. Second, if it is such an electrical article, is it an article named in the language, or within the class of articles named in this paragraph?

It should be noted that the above quotation was dealing with the "third division of this paragraph," being paragraph 353 of the Tariff Act of 1930, and that the language there construed is identical with that contained in the General Agreement on Tariffs and Trade, which we are called upon to construe in this case.

Based upon the record in this case, it may be admitted that the involved machine answers the first inquiry in the *Dryden* case, *supra*, but it is the answer to the second inquiry, *supra*, with which I am here concerned, and as to which I feel the holding of the majority is in error. Is the involved article named in the language, or within the class of articles named in this paragraph? No electric motors accompanied the involved machine, as was true in the *Dryden* case. This record makes it clear that there was not imported with or as a part of the involved machine an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, or any article *ejusdem generis* therewith. It is my view that the absence of any of the articles named in said paragraph, or an article *ejusdem generis* therewith, precludes classification of the involved machines under this division of said paragraph.

If, as appears from the opinion, the majority rely for their conclusion upon the *Dryden* case, *supra*, that case, instead of supporting the conclusion reached by the majority, appears to require the conclusion that the involved machines are not covered by the language here involved. If it is intended to rely upon the motors, which were installed in the machines after importation, to bring them within the provisions of said paragraph 353, then the *Dryden* case has no application, because in that case "Two electric motors accompanied the machine." Furthermore, in the absence of a provision to the contrary, imported merchandise must be considered for dutiable purposes in the condition in which imported. In the instant case, no motors and no article *ejusdem generis* with any of the exemplars named in said paragraph accompanied these machines. As stated in *Ralph C. Coxhead Corp.* v. *United States*, 22 C. C. P. A. (Customs) 96, T. D. 47080:

In order to come under this particular provision of the paragraph the importation must consist of an article containing, as an *essential feature*, an electrical element or device. Congress has given specific examples of articles which con-

tain electrical elements or devices as essential features thereof. In determining whether an imported article contains such an electrical element or device as an essential feature we should consider the examples which Congress has given.

My views herein appear to be in harmony with the holding by the Court of Customs and Patent Appeals in *United States* v. *Nichols Copper Co.*, 29 C. C. P. A. (Customs) 186, C. A. D. 190, as expressed in the following quotation:

> * * * We do not apply the doctrine of *ejusdem generis* as a rule of construction, but by the use of the words "such as" in the paragraph we are required to determine whether a substance not specifically named in the paragraph is like or similar to, or belongs to the same class as, the substances therein named. See *Comey & Johnson Co.* v. *United States*, 4 Ct. Cust. Appls. 285, T. D. 33493; *Frankfeld & Co.* v. *United States*, 7 Ct. Cust. Appls. 296, T. D. 36805; *United States* v. *Seward*, 9 Ct. Cust. Appls. 18, T. D. 37845; *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050.

The construction placed upon the provision here in question by the majority appears to ignore the words "* * * such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs." It is my view that we may not ignore the exemplars which Congress and the trade negotiators have written into the statute. This view finds confirmation in the case of Ex Parte the Public National Bank of New York, 278 U. S. 101, from which the following is quoted:

> * * * In effect, the contention for petitioner practically comes to this—that the general purpose of §266 being to safeguard state legislation assailed as unconstitutional from the improvident action of federal courts, the words "by restraining the action of any officer of such State in the enforcement . . of such statute" are without significance. In other words, we are asked to ignore the quoted words and read the section as though they were not there.

> But we are not at liberty thus to deny effect to a part of a statute. No rule of statutory construction has been more definitely stated or more often repeated than the cardinal rule that "significance and effect shall, if possible, be accorded to every word. As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' " *Market Co.* v. *Hoffman*, 101 U. S. 112, 115. We are unable to perceive any ground for departing from the rule in the case before us.

Likewise, in the instant case, I am unable to perceive any ground for departing from the rule announced by the Supreme Court of the United States, *supra*, and construe the statute here involved as though the exemplars there given were not there. I do not feel that we are at liberty to thus deny effect to a part of a statute.

This record fairly establishes that the involved machines were, at the time of importation, wired for certain electrical purposes, and that, after importation, further wiring is installed in order to fit the machines for operation by an electric motor. These machines, when imported, contain no electrical element or device, essential or otherwise, other than being wired for certain electrical purposes. The most

that can be said regarding this wiring is that it was electrical wiring apparatus, instruments, or devices. The trade negotiators have made it clear that it was never their intention to include within the provisions of said paragraph 353, here under consideration, machines "wired for certain electrical purposes" by expressly excluding from the operations of said paragraph "electrical wiring apparatus, instruments, and devices." Courts may not, by construction, include within the provisions of a statute merchandise which the framers thereof have in clear and unmistakable language excluded therefrom. It is apparent to me, therefore, that the involved machines, when imported, contained no electrical element or device which would bring them within the provisions of said paragraph 353, as modified.

The views herein expressed appear to be in harmony with the holding of the Court of Customs and Patent Appeals in *Julius Forstmann & Co.* v. *United States*, 28 C. C. P. A. (Customs) 222, C. A. D. 149:

> It is clear to us that in paragraph 353 Congress intended that all articles *ejusdem generis* with those named in the paragraph should, unless more specifically provided for elsewhere, take the rate of duty therein set out.

Based upon the record in this case, and being governed by the authorities herein cited, I would hold that since the involved machines do not contain any of the exemplars named in the involved paragraph, or any article *ejusdem generis* therewith, such machines are not included within its provisions, and are, accordingly, dutiable as classified by the collector.